This is number 23-1554 Michael Rivera against Lieutenant Redfern Etal. Ms. Rao. May it please the court. Meg Haran for Plaintiff Appellant Michael Rivera, and I'd like to reserve two minutes for rebuttal. Granted. So immediately after Michael Rivera, who was an asthmatic, learned that officers planned to deploy pepper spray nearby, he began pleading with them to move him away from the open air telephone cage back to his cell, which was just 25 feet away. And over the course of the next 90 minutes, the unit was completely calm. Every single prisoner, except Mr. Rivera, was in their cell behind closed steel doors, and officers walked around the unit. But none of them helped Mr. Rivera. And at the end of that 90 minutes... Excuse me. I'm sorry. Was the cover on the cell up all the entire time that this was going on? The cover on the cell, Your Honor? The, you know, the sheet or whatever he was covering up the... The other prisoners. Miller. Miller's. Your Honor, that's not clear from the record what was going on with that. You know, you can't see into that cell. What we do know from the record, from the CC video, is that even Defendant Schreck, so that's the officer that was placed near Prisoner Miller's cell and was sort of standing guard there. You know, there are entire minutes, and I point this course specifically to, you know, the five-minute period starting at 644 p.m., where you can see that Officer Schreck, you know, leaning on the railing, looking away from Prisoner Miller's cell, looking out over into this completely calm unit, almost that entire five-minute period, barely glancing back at Prisoner Miller's cell. So I think a jury could look at that and say, you know, even this officer didn't think that this was a sort of high alert situation. Even this officer wasn't paying close attention to that prisoner. Well, we really, I mean, what is at stake here? And I would really like to ask you about the qualified immunity question that we're confronted with. But if we could put this into context, we really are, in the midst of all the facts that you're reciting, and I'm not disputing any of those at this point, dealing with a situation where there were conflicting obligations on the part of the officers on the floor at that time in the SHU, right? I mean, they had your client in a telephone, an open telephone booth kind of thing, and they have Miller, who apparently is being difficult, and as Sherika has pointed out, had a blocked window in his cell. They had conflicting obligations here, didn't they? Your Honor, I think a jury could find that those competing obligations were not so time-sensitive or so emergent that these officers... But you just said, I, in reference to yourself. We're talking about looking at how the officers themselves had to deal with competing needs at that time, institutional, as well as those that represented a potential danger to your client, Mr. Rivera, and a potential danger to Mr. Miller if he was possibly suicidal. Your Honor, I certainly don't mean to suggest what I think matters. I think what matters is what the jury would think. And a jury could look at the facts here and say that perhaps there were competing obligations, but they were certainly not so time-sensitive that the officers couldn't move Mr. Rivera 25 feet at some point over the course of 90 minutes. You know, 25 feet is less than the width of this courtroom. How many people did they have there? They had four people plus the nurse? Is that right? Your Honor, I believe there were at least eight people there. So we have the four defendants, which includes the nurse defendant. There were three other officers on the extraction team, and then one... I inaccurately ask people, how many officers were there needed to extract Mr. Miller plus the nurse? So I believe there were four people that were part of the extraction team. Isn't the state's position that we didn't have enough people to take Mr. Rivera back to his own cell and perform the extraction, which according to testimony, in fact, I think maybe even your own client had indicated may take up to 90 minutes to complete? So, Your Honor, a couple of points there. First, that is their position, but it's not clear for a number of reasons whether they actually needed, you know, multiple people to move Mr. Rivera. The only evidence in the record is... That would be second guessing again, what prison administration and the COs on the scene determined they did need. Your Honor, deference to corrections officers doesn't mean kind of automatically believing everything they say, right? We look to the facts in the record, and the facts in the record show that, you know, the only evidence that you needed two people to move someone came from a comment by Mr. Rivera that that was usually the case, not always. But even if it was always the case that you needed two people to move Mr. Rivera, I think there are at least a couple of theories that a jury could say, hey, these officers were still deliberately indifferent. You know, first, it certainly doesn't take two people to give him a mask, give him an inhaler. Even if it did take two people, and even if we are only talking about moving Mr. Rivera, you know, it's a reasonable inference that two people were available at some point in 90 minutes to move him. You know, we had officers... Let's assume you're right about that, because you're quite right. The video does seem to be full of sort of calm behavior. In fact, much of the video was one of the officers, perhaps, Shrek, seeming to cajole Miller to do what he was supposed to do, right? I mean, they didn't just rush in there. There was a lot of interaction, right, before the extraction team went up. Absolutely, Your Honor. And I think one important point there is that several members who were later part of the extraction team were on the pod during that course of that 90 minutes, doing other things, walking around. So I think a jury could say... All right, so let's assume that your client could have been moved from the telephone cage back to his cell. One of the things the case law consistently tells us, from the Supreme Court and circuit opinions, is that we're not in the business of micromanaging how the prisons run their affairs. Would you concede that? Certainly, Your Honor, but what... All right, so let me just follow up with, why is it enough that he's asthmatic to jump to the conclusion or lead to the conclusion that he must be moved? The pepper spray was injected into the cell with the cell door closed. You know, they breached, and correct me if I saw something different than you saw, but what I saw in the video was the breaching tool was used to open up the hole in the door where the prisoner can stick his arms out to be handcuffed, correct? That's correct. And the pepper spray was injected into Miller's cell, correct? That's correct. And that's up on the second floor, some 40 or 50 feet away from the phone cage, correct? That's correct, Your Honor. All right, so why is it obvious, without the benefit of hindsight, that that activity would somehow cause Miller to suffer the kind of adverse health reaction, recognizing that they knew he was as asthmatic? That didn't seem to me to be a foregone conclusion. We know that to be the case based upon his physical reaction after the fact. But how do we know that that was obviously going to happen to him? Sure, I think the officers here had plenty of notice that that was going to happen. So first, they were told repeatedly by Mr. Rivera that it was going to happen. It's clear from the record that pepper spray was used pretty frequently here, and so all of these officers had experience with pepper spray. But how could Rivera himself know it was going to happen if he had never suffered that reaction before? Well, he knew it was going to happen because even when he was in the four steel walls enclosed in his cell, he still suffered some reaction. All right, so we don't know whether putting him in his cell is going to put him in a better position than leaving him in the phone cage. I don't think that's right, Your Honor. Actually, putting him in his cell would have placed him farther away just in terms of feet than where he was in the telephone cage. Is that correct? Or closer? I'm not sure the exact distance, Your Honor. But what Mr. Rivera has testified to, what's in the record, is that when he was in the cell. He's been exposed. Where was his cell, though? The cell was on the lower floor, Your Honor, as well. A different floor or the same floor? So it was in the same unit on the lower floor. The same as it should. All right. So when we look at the video, the telephone cage was on the right. Yes. And then the stairs are kind of in the middle right and then up to the left is the second floor where Miller's. So relative to Miller's cell, where was Rivera's cell? I believe it was down and to the right. And so. Down and to the right. So that's a little bit closer or equidistant than the Miller's cell? Your Honor, I think it may have actually. I'm not sure, Your Honor. I don't want to speculate. But what I do know is that the record says that, you know, when Mr. Rivera was in his cell, he was protected by the steel doors. He could use his inhaler. He could put a wet rag over his face. Beyond that, does the record show, does not the record show that he had, that there were previous experiences when he was in his cell, that he was exposed to pepper spray and reacted to it, but that he would put a wet rag over his face and that that protected him. Yes. And that he would also have access to his inhaler. Yes. So he had prior experience with this in his cell. And does the record also show that the nurse, whose name is escaping me right now, had, was aware and had a discussion or brief exchange with Mr. Rivera over his asthmatic condition and indicated that the other officers were aware of this or another officer was aware of this on the scene. Is that right? Your Honor, all of the officers were aware of that. Because Mr. Rivera repeatedly told them that he was going to suffer this attack if he wasn't moved. And, you know, I'd note that the officers, I think, would also have noticed that this would affect Mr. Rivera, particularly in the open-air cage, because, you know, they all themselves wore gas masks. They all understood that even if you're outside of Miller's cell and the burst of pepper spray goes into that cell, other people are going to be exposed. And in fact, you know, Mr. Rivera vomited repeatedly. He felt like he was drowning. He couldn't breathe properly until he received that nebulizer treatment later on. And so I think there's plenty of evidence in the record to show that the defendants certainly, you know, were on notice that this was a serious harm that could impact Mr. Rivera. All right. Let's go to the hard part of the case. What case from the Supreme Court of the United States or from this circuit put Redfern and others on notice that failing to move your client from the telephone cage to his cell would violate clearly established law? Sure. So, Your Honor, I'd like to talk about two different theories that I think would both apply here. Before you talk about the theories, please cite for us the Supreme Court case or the Third Circuit case that is the clearly established law. All right. So I think both Beers Capital and Kedra cases from this court say no qualified immunity when officers can be found deliberately indifferent. So I think I think that's one set of case law from this court. All right. But you just stated a really broad legal proposition. If there's one thing that circuit courts have been admonished time and again by the Supreme Court is to not to define the right at too high a level of generality. And it sounds to me like you just did that. Well, Your Honor, that's what this court did in Beers Capital. And the Supreme Court's admonitions on that point have been repeatedly in Fourth Circuit cases. Sorry, Fourth Amendment cases, fast moving cases where the court has said we require specific particular specificity in that context. Are you proceeding on a deliberate indifference theory? We are, Your Honor. The court doesn't, because I am assuming that we're addressing a need to reach the qualified immunity issue that has been raised or the claim of qualified immunity that has been sought, didn't, and I'm forgetting what number footnote it was, but the footnote in Beers Capital, this essentially says that deliberate indifference is really incompatible here with what is required to demonstrate qualified immunity. Do you follow me? Yes, Your Honor. So I think that is what Beers Capital said, that when officers can be found deliberately indifferent. So if that's the case, then do we really have the choice of the order of battle that Pearson left us with? But rather, we are required to go to the merits here and decide. Well, Your Honor, Pearson gave the lower courts flexibility to do the order in any order they wanted. And it said it will still often be beneficial to do the constitutional inquiry first. And so I don't think there's anything inconsistent to say in deliberate indifference cases. It is going to be beneficial. You also got a footnote from the Supreme Court saying if you're going to go to the merits, think, think and think again about it. Sure, Your Honor. And if this court doesn't want to apply the Beers Capital rule, which again, you know, the other side doesn't contest, but that is binding precedent here. Getting back to Judge Hardiman's question, where can you find anything even close to this where the so-called victim here is actually a second party? We're talking about secondhand exposure. The force, if we want to call it that, was not directed to him. Sure. So where is that in any of the cases? Your Honor, I think this court's decision in Atkinson provides more factual similarity to this case than this court has often found required in Eighth Amendment deliberate indifference cases. So in Atkinson, that was a secondhand exposure case to a dangerous airborne substance. That substance had known health impacts. The prisoners made repeated requests to be moved and the officers refused to move that prisoner and those officers were denied qualified immunity. And I think as this court's precedent states... Atkinson, that's a secondhand smoke. So you're quite right to go there in light of Judge Smith's question because it was secondhand. But he's in a cell with a smoker for seven months, right? Yes, Your Honor. I don't think that's a meaningful difference for purposes of qualified immunity when you're talking about the Eighth Amendment deliberate indifference context. So, for example, this court's decision in Clark v. Coop, that was a case about solitary confinement. This court relied on cases like Rhodes, like Farmer, about totally different topics to say, hey, those cases define the law at the right level of generality. And those cases said, you know, imposing conditions that cause pain and then doing absolutely nothing about those cases. That was the clearly established law that we are going to apply in this case about solitary confinement. So, of course, those same principles apply equally to the case at hand. And in addition to that, we have cases like Atkinson, like Helling, that talk about secondhand exposure and talk about officers being repeatedly asked to be moved and then denying that. And I think, you know, the fact that it was over a longer period of time in Atkinson is not particularly relevant. I wasn't only asking about a setting or a factual situation involving secondhand exposure, but where the agent was actually deployed intentionally against the plaintiff in the case, the so-called victim in the case. Your Honor, I think that would be looking for a level of factual similarity that is just not required in Eighth Amendment deliberate indifference cases. You know, again, I think every case, you know, that the other side points to, not one of those arose in the deliberate indifference context. The case was talking about requiring specificity. And then again and again, this court has defined the law at a higher level when you're talking about deliberate indifference cases. So in that context, when you are looking at cases like Atkinson, that is factually similar in all meaningful respects. I don't think, you know, you need to look for exact fact-matching like you would in the fast-moving Fourth Amendment context. And I think the Supreme Court has been clear about that, too. You know, over and over in Mullinex and Westby and Kissela, it said we need that sort of factual specificity in prior case law when we're talking about fast-moving Fourth Amendment situations. When it's taken deliberate indifference cases, it has not looked for much factual similarity at all, right? That's Hope, that's Taylor v. Riojas. In those cases, the Supreme Court has defined the law at a very high level of generality. And I think that says something about, you know, the specific context of deliberate indifference cases and qualified immunity. And in Atkinson, I think the important point is that those officers were repeatedly asked to be moved, just as the officers here were repeatedly asked about moving Mr. Rivera. And in both cases, about secondhand exposure to a dangerous, toxic substance, after being repeatedly asked, the prisoner was not moved. And that is enough factual similarity under this Court's case law. We'll hear you on rebuttal. Thank you, Ms. Roth. Mr. Scorinci, did I pronounce that correctly? Mr. Scorinci, yes. Scorinci. Yes, sir. Thank you. May it please the Court, Michael Scorinci from the Pennsylvania Office of Attorney General on behalf of Appellees. Could I ask you to start with the standard of review? You don't concede it's deliberate indifference, correct? That's correct, Your Honor. Our position is that the correct standard is the malicious and sadistic intent to harm standard. All right. But you didn't argue that in the district court. That was the first thing I was going to address, Your Honor. So you're stuck with the fact that we can affirm for any reason supported by the record. I have several reasons why you can reach this in the exercise of your discretion. First, this is an important issue. It's, as the Ninth Circuit said, these type of cases where we have competing... not having raised this before. Joseph, I think, said there has to be exacting particularity, correct? But I think we fall within several exceptions to the forfeiture rule. One is, as I said, this is an important issue. It's a case that the Ninth Circuit has said is an outlier. Our forfeiture rule is so much more vigorous than the Ninth Circuit's that that doesn't help you at all. No, I'm not saying... I don't... I think you've got to argue that we can affirm for any reason... That's on my list, Your Honor. I have a list here. Always, always take a proffered helping hand. Sure. Yes, you can affirm for any reason appearing on the record so long as the issue is not waived. Even a forfeited issue, you can reach. And I know you specified the difference in U.S. v. Dowdell, the difference between a forfeited issue and a waived issue. We did not intentionally abandon this issue. It was an inadvertent mistake. All right. But so let's assume for a minute that we can consider the issue. I'm struggling with which to apply because here we've got... The case in some ways feels like a conditions of confinement case, in which case it would be delivered indifference. And in other aspects, it seems like an excessive force case, in which case the standard you're now proffering might be the right standard. Help us decide which is proper because pepper spray is undoubtedly the use of force, but yet to Ms. Rahm's point, this was not an emergent situation. There was plenty of time, it seemed to me, to get a couple of officers to move Mr. Rivera, to basically to accommodate his request to be moved to his cell. So in that sense, it seems like a condition of confinement or a failure to do something case rather than an excessive force case. Your Honor, this was an emergency. What Mr. Miller said moments after he came out of his cell, he was forcibly extracted out of his cell, was, take me to a psychiatric observation cell. I'm feeling suicidal. This was an emergency and because it was an emergency, there were competing institutional concerns here between the life of Mr. Miller and the health of Mr. Rivera. Now, there was 90 minutes that passed here. Jeff, I'm consistent with Supreme Court case law. I don't want to second guess how the prisons are run. I don't think that's our job. But watching the videos, if that's your definition of an emergency, we have very different definitions of emergency. I watch guys in protective gear. I watch a guy have to get a new mask because it didn't fit. I watched Lieutenant Redford describe in extremely dispassionate, hyper-detailed terms what was about to happen, apparently for good reasons to make a record. That's an emergency. 90 minutes is undisputedly the standard amount of time that takes to use a planned use of force. During that time, my clients took several proactive measures. How long would it have taken them to move Rivera from the telephone cage to his cell? To move Rivera would have required two officers. At the time, they did not have two officers. How long would it have taken them to move Rivera from the telephone cage to his cell? It's not in the record, Your Honor, but I think it would have taken 10 to 15 minutes, given that they would have had to handcuff him, use two officers, and bring him to his cell. It's not an immediate process of just bringing someone out, so he has to be handcuffed and secured. Can you help us as to where his cell was located? I believe he was on the first floor, as counsel said here, but I believe he was past the stairs. I'm not sure if it was to the left or to the right, but I think it was, you know, 40 to 50 feet, something along those lines. Do you understand, though, my trouble with this? Because I understand that the court should show some deference to the prison authorities when they're acting under emergent circumstances, but you're not suggesting, are you, that we have to accept as unabashed truth a declaration that an emergency occurred? Aren't we supposed to evaluate or required to evaluate that? There is, I mean, there is, yes. The court has said over and over again that there's a level of deference to the officers. I think what they said is that there'd have to be substantial evidence that the prison's response was exaggerated. Here, as I was saying before, there were several measures that the officers took, putting on protective gear, making a plan of action, assembling a team, and preparing the video. And during that time, also, Your Honor, several employees were trying to coax Mr. Miller out of his cell voluntarily. Because for my clients, the use of force is a last resort. Very, very good point. So do we know from the record when the decision was made to put the extraction team together, which would possibly or probably result in the deployment of the pepper spray? I don't know the exact point, Your Honor. I know there was discussion about it, and then several officers tried to coax him out. And even, I think, Mr. Rivera said it was his understanding that he thought, based on his conversations with the officers, that Mr. Miller was going to come out, that he was going to be convinced that this happened a lot, that he has a mental illness. So this was an ongoing situation until, I guess, the point where they decided it was time to get him out forcibly. Your Honor, if you look at Whitley,  We don't know. We have no idea whether they- We don't know exactly when they decided that finally they were going to go in using- But it wasn't at the beginning of the 90 minutes? I don't think so. I think their plan was always to be a last resort and for the officers to try to convince him, including the nurse, to try to convince him to come out without having to use pepper spray. If you look at Whitley, Your Honor, that was a case that actually took two hours. That riot started at about 8.30, and it wasn't until about 10.30 that the officers came in. And if you look at the Fourth Amendment context, I cited several cases there. The other circuits have said it can take between 45 and 90 minutes, so long as the police were taking proactive measures. And that's exactly what my officers were doing here. They were taking protective measures for themselves and for the- It just seems so factually different than Whitley. I mean, this is not a prison riot. Your Honor, I acknowledge that- This is one noncompliant inmate. Yes, I acknowledge that Whitley is factually distinguishable, but as the High Court does in so many of the cases that it takes, it lays down broad principles of laws for application to other cases. In fact, a dozen years after Whitley, the Court expanded in County of Sacramento v. Lewis, expanded that idea of competing concerns not only to a prison riot, but to a high-speed chase. That was a high-speed chase case, and it was also a substantive due process. But in the substantive process analysis, Your Honor, they're also applying an Eighth Amendment standard. And if you look at some of the circuit court cases I've cited, they're also grappling with this competing concerns in different scenarios. They may not be applying the correct standard, but they're noting that this is competing concerns. We had one in the Eighth Circuit where it was an officer who was transporting an inmate for a medical appointment, and he got involved in an armed robbery. So I think this fits within that competing concerns. But even if Your Honors are troubled about what standard to apply, this case still does not, there's still not evidence of deliberate indifference. Take you back to Judge Hardiman's earlier questions about these, about what standard ought to apply here, whether we're talking about deliberate indifference or excessive force. Just a very simple question, and that is, should it matter as to our determination concerning which standard applies that the so-called force here, the deployment of pepper spray, was not directed against Mr. Rivera himself, but that, in fact, he experienced it on a secondhand basis? Should that matter as to whether or not we are talking about deliberate indifference or whether we're talking about excessive force, which, as I've already suggested, would have been force directed against this prisoner himself, who is now the plaintiff? I think for the intent to harm, it's very clear that the intent was toward the other inmate. You see a lot of Second Circuit cases, district court cases, where they say as long as it's directed at somebody else and not that inmate, it can't meet the intent to harm standard. I think if you look at the deliberate indifference standard, I'd probably look at it a little bit different way, Your Honor. If you look at your model instructions for deliberate indifference, you give several examples of what deliberate indifference is, a denial of a reasonable request for medical treatment or an intentional refusal to provide that treatment. Here, at the time, Mr. Rivera made the request to be moved. It was not a reasonable request. He was trying to avoid having to need medical treatment. That seems like a less intrusive request. If his request to be moved to a cell had been honored, there might not have been a need for nebulizer. There might not have been a need for medical attention. I agree, Your Honor. But my point is the request at the time to be moved was not reasonable because there was the ongoing emergency situation going on with Mr. Miller. Another example you give in your instructions is an intentional refusal to provide treatment. If we sort of massage that intentional refusal to move him, well, the intent here was not to refuse him treatment. I use the example where the intent was not to refuse to remove him. I use the example in my brief of someone at a hospital. Someone goes to the hospital with an asthma attack. They can't expect to get immediate medical care right away if there's someone having an acute... Well, I don't think there's a dispute that he was tended to here. No, I'm not... The argument from the other side is that he shouldn't have required it. Yes, that's not my suggestion. I'm saying if we talk about it in the context of there was not an intent to refuse his request to be moved. The intent was to deal with the situation at hand. And once that was addressed, we see that they were taking all kinds of measures to address his situation. They made the decision not to move him because they had other priorities. Right, but their intent was not to refuse. Their intent was to deal with the other situation. I use the principle of double effect in my brief where we talk about your intent when you're faced with deadly forces, not to kill the other person, but to self-defend. It's the same idea here. The intent was to deal with this situation, not to refuse Mr. Rivera's request. Let's assume that you lose on standard of review. Let's assume we applied deliberate indifference. And let's assume that we think it was not an emergency and that your clients were deliberately indifferent to his medical need. How do you win on qualified immunity? Well, we win on qualified immunity, Your Honor, because the standard here is not clear as to whether it's deliberate indifference or malicious and sadistic intent to harm. My officers are entitled to not only reasonable mistake of fact, but also reasonable mistake of law. So if they do not know what the law is, they can't have possibly knowingly violated the law. Your Honor, as you asked about my adversary pointed to Atkinson as a similar case. As you pointed out, Atkinson is about prolonged exposure, an unreasonable prolonged exposure to tobacco smoke over seven months. It's a factually distinguishable case. I also wanted to point to something that my adversary said in her reply brief about the standard here. She had made the point that the high court does not insist that courts must have agreed upon the precise formulation of the standard. And what I think that's referencing is the particularization of the right. Different courts don't have to agree about how the right is exactly particularized, but they do need to agree on what the standard is. My clients couldn't have knowingly violated the law if they did not know if it was deliberate indifference or malicious and sadistic intent to harm. Your Honor, just to go back to deliberate indifference, if I can, for one second. When you talk about deliberate indifference, the standard is criminal recklessness or wantonness. And part of the analysis on wantonness depends on the constraints facing the official. So I think no matter whether you think about this case as malicious and sadistic intent to harm or deliberate indifference, you need to consider the circumstances that were facing my clients at the time. They were dealing with an emergency situation, an inmate who was undisputedly showing signs of suicide. I've cited the several district court cases that noted where an inmate is covering his cell, the cell window, that is a sign of potential self-harm. And that was confirmed by what Mr. Miller said just moments after he attacked his son. But that's not really what's at issue here, is it? I mean, what's really at issue is, could they have done both, that is, taken care of Mr. Rivera and taken care of Mr. Miller's situation, rather than make the choice that they made? Isn't that what this comes down to? Yes, Your Honor, and they could not because this was a small staff. I know they pointed to an officer who was going around making rounds. He was doing, there was only one officer, and he was doing it far less frequently. There were not two officers available to move Mr. Rivera from his cell at that point. Any time in the record we see someone being moved in this record, it's two officers, whether to his cell or to back his cell, it's two officers. And this is one point that I don't know whether it is significant, but this was not taking place in general population. This was an R.H.U. or an S.E.G. Absolutely, yes. That's correct, Your Honor, and the R.H.U., as I pointed out in my brief, is a small staff. Your Honor, I see that my time is up, unless you have a question. If you have any further questions, I'll rely on my brief. All right. Thank you, Mr. Scroggins. We'll hear rebuttal from Ms. Romm. Ms. Romm, isn't it the case that if they'd taken five minutes to move your client to his cell, and during that time, Mr. Miller had harmed himself or killed himself, that we'd be sitting here with a personal injury suit against the prison, saying that they were deliberately indifferent to the medical needs of Mr. Miller? Your Honor, that might be a very different case, but I think from the facts here... Well, it's a different case from this case, obviously, but my question to you is, isn't that what would have, I guess, put another way? Couldn't five minutes make a big difference here for Mr. Miller's health? Well, Your Honor, the defendants already decided that it was okay to wait nearly 90 minutes. And so, you know, we're not necessarily saying they had to take additional time after that. What we're saying is, at some point in that 90 minutes, was it possible to move Mr. Rivera a mere 25 feet? Now, my friend on the other side said it would take 10 to 15 minutes to move him. You know, that number is completely out of thin air. Well, that's why I said five. I think, I can't imagine that. Especially for a guy who wants to be moved, he's going to comply with getting handcuffed and moved. Absolutely, Your Honor. And I think a jury could find that it would take even less time. And that at some point in 90 minutes, that the officers could have taken a couple of minutes to move Mr. Rivera, or to do something that takes even less time. How do we know exactly when in the record a decision was made to forcibly extract Miller? Well, Your Honor, we know that Mr. Rivera said as early as 540, he heard them talking and saying that that was a very likely possibility, right? But I'm not asking about a possibility. But when, when, maybe we don't know. Does the record tell us when a decision was made that we are done with persuasion, cajoling, begging? We are going to have to go in there and spray this guy and get him out of there. Do we know when that decision was made? It doesn't, Your Honor. And as a non-moving party, Mr. Rivera would be entitled to the inference that, you know, it was early on in that time period. But Your Honor, before I sit down, I do want to make one final point about the qualified immunity inquiry. You know, my friend on the other side suggests that if the standard is ambiguous, that they're entitled to immunity. You know, I guess I want to make two points. First, that it is absolutely clear what the standard is. This court in Davis I and Davis II applied the deliberate and different standard to secondhand pepper spray exposure cases. They pointed to no cases in the Third Circuit applying a different standard. In fact, it was so clear that they argued the deliberate and different standard below. But even if there was some sort of question about what standard applied, I think Saussure said, when certain conduct is found unconstitutional, that is sufficient. And here, you know, we pointed to Atkinson, a case that concerns very similar conduct, that is the refusal to move someone away from secondhand exposure to a dangerous substance after they have repeatedly asked to move. And in light of this court's decisions in cases like Coop, you know, that is more specific than the sorts of prior case law that this court often looks to in Eighth Amendment deliberate and different cases. Thank you. Thank you very much, Ms. Rahm. Thank you, Mr. Skrinky. The court will take the matter under advisory.